**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **PROJECT DESIGN & PIPING, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CAUSE NO. 1:21-cv-00266-SLC** |
| ) | |
| **SIEMENS INDUSTRY INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Plaintiff Project Design & Piping, Inc. ("Project Design"), filed this breach of contract action against Defendant Siemens Industry Inc. ("Siemens"), on June 15, 2021, claiming that Siemens failed to perform contractually obligated subcontractor duties in a construction project. (*See* ECF 3-2).[1] Subsequently, on June 22, 2021, Siemens advanced counterclaims of breach of contract and "account stated" against Project Design. (*See* ECF 8 at 5-8). Now before the Court is Siemens's motion for summary judgment (ECF 47), a memorandum in support of summary judgment (ECF 47-1), a statement of undisputed material facts (ECF 47-2), and supporting evidence (ECF 47-3 to ECF 47-30) filed on May 20, 2024. Project Design responded with a brief in opposition (ECF 58), along with a response to Siemens's statement of facts (ECF 59), and supporting evidence (ECF 59-1), on July 29, 2024. Thereafter, Siemens filed a reply brief on August 23, 2024. (ECF 60). Therefore, the motion is now ripe for ruling.

For the following reasons, Siemens's motion for summary judgment will be GRANTED IN PART and DENIED IN PART, and Siemens will be granted leave to file a second summary judgment motion as set forth herein.

---

[1] Subject matter jurisdiction arises under diversity jurisdiction, 28 U.S.C. § 1332. (*See* ECF 3). Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (*See* ECF 30).

## A. Statement of Material Facts[2]

### 1. The Project

Project Design is a mechanical contractor whose business involves installing HVAC systems in large institutional buildings. (*See* ECF 59-1 at 4). In 2017, Project Design was the mechanical contractor for a construction project (the "Project") at Parkview Wabash Hospital located in Wabash, Indiana. (*See* ECF 59 ¶¶ 1, 2). In Project Design's contract with the general contractor, Project Design was required to substantially complete its work on the Project by April 1, 2018. (*See* ECF 47-13 at 2, 13). At some point, Siemens submitted a bid to become Project Design's controls systems subcontractor for the Project. (*See* ECF 59-1 at 13; *see also* ECF 47-28 ¶ 8; ECF 59 ¶ 16).

### 2. Project Design Sends the Purchase Order to Siemens on or about February 13, 2017

The parties' communications of record relevant to contract formation, as to the Project, begin in mid-February 2017. (*See* ECF 59-1 at 12-18). On February 11, 2017, Project Design emailed Siemens stating it had received "Siemens Base Bid[,]" was attaching the general submittal requirements, and that "[t]hey have accepted the change in AHU's and gone with the TEMTROL revised fanwall units which per your e-mail, is no cost change to you." (*Id.* at 13). The email further stated: "Your contract number is 1646-315 and it is being typed up now. Please get rolling on shop drawings and call if you have any questions." (*Id.*). Between February 12 and 14, 2017, the parties further discussed the scope of work. (*See id.* at 12, 14-18 (discussing a missed revision to the parties' scope of work, among other topics)). Siemens sent Project Design a proposal, in the form of a five-page memo, dated February 14, 2017, including the scope of work to be completed for the Project. (*See id.* at 14-18 ("Siemens . . . is pleased to provide this

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Project Design, the nonmoving party. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

proposal for a new Siemens building automation and temperature control system for the new [Project].")).

On or about February 13, 2017, Project Design issued an unsigned "Purchase Order 1646-315" (the "Purchase Order") to Siemens for the purpose of Siemens "provid[ing] labor, materials and equipment required to furnish and install all temperature controls, control panels, software, programming, VFD's, control dampers and miscellaneous control components per plans, specifications, addendums and approved shop drawings" for the Project. (ECF 47-14 at 4; *see* ECF 47-6 at 38; ECF 59 ¶ 4).[3] In short, Siemens was to serve as Project Design's "control systems subcontractor" on the Project. (ECF 59 ¶ 16). The agreed upon and reasonable value of the work to be performed was $452,050, pursuant to the Purchase Order. (*See* ECF 59 ¶ 14; *see also* ECF 47-14 at 4).

Apparently, Project Design cannot locate the Purchase Order it sent to Siemens on or about February 13, 2017. (*See* ECF 58 at 5; *see also* ECF 59 ¶¶ 15, 15.a). The only version of the Purchase Order of record is the single-sided one returned by Siemens to Project Design on March 30, 2017, to be discussed *infra*, which states on its face: "This Agreement is subject to all provisions and conditions on the reverse side, including those limiting warranties . . . ." (ECF 47-14 at 4 (capitalization omitted); *see* ECF 3-1 at 11; ECF 3-2 at 5)). As an exhibit to its summary judgment motion, Siemens filed a single-page terms and conditions form, containing fifteen numbered paragraphs (the "Terms and Conditions"), which Project Design contends would have been included on the reverse side of the Purchase Order sent to Siemens on February 13, 2017. (ECF 47-24; *see* ECF 59 ¶ 15.e). Project Design indicates that it routinely included the Terms

---

[3] Although the record does not identify the date Project Design actually submitted the Purchase Order to Siemens, (*see* ECF 47-6 at 34-35 (demonstrating the parties' uncertainty as to when and how the Purchase Order was delivered to Siemens)), there is no dispute that the Purchase Order is dated February 13, 2017 (*see* ECF 47-14 at 4).

and Conditions on the reverse side of its purchase orders during the relevant period. (*See* ECF 59 ¶¶ 15, 15.a, 15.e; *see also* ECF 47-6 at 229-30).

### 3.   The Parties' Actions from February 14, 2017, to March 30, 2017

On February 14, 2017, Siemens emailed Project Design, stating: "Attached is an updated scope letter with all the pricing adjustments shown. Looking forward to working with you!" (ECF 59-1 at 12). As previously mentioned, the record includes a five-page memo, dated that same day and issued from Siemens to Project Design, "provid[ing] [a] proposal for a new Siemens building automation and temperature controls system for the [Project.]" (*Id.* at 14).

On February 22, 2017, the parties exchanged emails concerning the submittal process. (ECF 59 ¶ 5.h).[4] On March 9, 2017, Siemens sent a request for information to Project Design. (ECF 59 ¶ 5.n).[5] On March 10, 2017, Project Design forwarded to Siemens an invitation to a coordination meeting, upon Project Design being told by the general contractor that "any second tier subcontractors that may be involved in any of your low voltage cabling" installations should attend. (ECF 59-1 at 19; *see* ECF 59 ¶ 5.i).

---

[4] Project Design asserts the following explanation of a submittal in large construction projects:

> In large construction projects it is common practice that after a contract (or subcontract) is awarded to a contractor, the contractor will prepare detailed drawings of the work they will perform. The drawings are submitted to the project engineer for approval, and the detailed information provided by the contractor is referred to as a "submittal."

(*Id.* ¶ 5.g (citations omitted)).

[5] Project Design explains as follows regarding the request for information process:

> In large construction projects, a contractor or subcontractor who needs information about the specifications or other matters related to their work can send a request for information, or "RFI," to the party that engaged the contractor. A contractor looking for information would use an RFI after it has entered into a contract, not before.

(ECF 59 ¶ 5.m (citation omitted); *see also* ECF 59-1 at 11, 26).

On March 13, 2017, Siemens emailed Project Design stating this its project manager, and a subcontractor of Siemens, would attend the coordination meeting, which was set for March 16, 2017. (*See* ECF 59 ¶ 5.j; *see also* ECF 59-1 at 20). On March 17, 2017, Siemens's operations manager informed its workers that the Project "was a 'must win' for [the Siemens] team[,]" that the "booked margin" was negative 13.5%, and that the team needed to "come up with a plan to bring this up to 0% by the end of project completion." (ECF 59-1 at 249). Siemens attended a Project-related meeting the morning of March 30, 2017. (*See* ECF 59 ¶ 5.l; *see also* ECF 59-1 at 21-24; ECF 60 at 16).[6]

#### 4.   Siemens Returns the Purchase Order with the Addendum

On March 30, 2017, at 1:06 PM, Siemens emailed Project Design, apologizing for the delay and stating: "Siemens has reviewed and accepted [the Purchase Order] for the [Project], *subject to the previously agreed addendum*. [O]nce signed, please email me the fully executed document." (ECF 47-14 at 2 (emphasis added)). Attached to the email was the Purchase Order signed by David Morgan and Wendy Rodriguez of Siemens on March 7, 2017, and March 23, 2017, respectively, together with a one-page "Addendum 1 to Purchase Order 1646-315 ('Agreement')" (the "Addendum"). (ECF 47-14 at 4-5). On the face of the Purchase Order was a text box, stating: "Addendum 1 Attached hereto is incorporated herein and made a part hereof by this reference[.]" (*Id*. at 4 (capitalization omitted)).

The Addendum, dated March 6, 2017, seeks to "[r]evise" paragraph 12 and "[a]dd as new" paragraphs 16 and 17. (*Id.* at 5; *see* ECF 59 ¶ 7). Paragraph 16 of the Addendum addresses Siemens's liability for claims arising from Project Design's third-party contracts, and Paragraph

---

[6] Although this point is not dispositive, the parties appear to dispute whether Siemens attended one or two project meetings during the month of March 2017—prior to Siemens offering the Addendum to Project Design. (*See* ECF 58 at 4; *see also* ECF 60 at 16).

17 addresses Siemens's maximum liability under the Purchase Order. (*See* ECF 47-14 at 5; *see also* ECF 59 ¶¶ 8-9). The Addendum states: "The parties agree that this Addendum modifies the Agreement between the parties dated February 13, 2017[,] and is incorporated therein by this reference." (ECF 47-14 at 5).

Project Design states that it never discussed the terms of the Addendum with Siemens, before or after March 30, 2017. (*See* ECF 59 ¶¶ 5-7, 11; *see also* ECF 59-1 at 6). That is, Project Design neither agreed to the Addendum, nor objected to it. (*See* ECF 59 ¶¶ 5-7, 11, 13-15).

5. Contract Performance

The Purchase Order obligated Siemens to provide and build a system "that managed many of the mechanical systems." (*Id.* ¶ 23).[7] The parties refer to this system as "the building automation and temperature controls system ("BAS")." (*Id.* ¶ 4). A BAS—which is a part of a heating, ventilation, and air conditioning (HVAC) system—controls cooling and heating in a building. (*See id.* ¶¶ 17-18).[8] Siemens was expected to write programming logic so that the BAS

---

[7] The parties agree on the following:

> The few exceptions to this contract were local control systems that came with specific pieces of equipment. Those systems were provided by others under contract to the general contractor and the mechanical contractor, [Project Design]. For instance, the boiler control systems, including a communication card called a BAC.net card, were provided by the boiler manufacturer. The chiller control systems, including a BAC.net card, were provided by the chiller vendor. Both were specified to be factory installed systems.

(*Id.*).

[8] The parties agree that a BAS can be described as follows:

> The BAS is in essence a server, a computer, where programming resides that monitors and controls many, but not all, aspects of the mechanical systems. Multiple operators can access the server remotely to control many building mechanical systems. The work product that goes into such a system involves making the system communicate with various mechanical devices and sensors, and creating logical programming that allows mechanical systems to be controlled, logged and viewed.

(*Id.* ¶ 21 (citation omitted)).

would direct the various components of the HVAC system to act to the Project's specifications. (*See id.* ¶¶ 21-23).

In the fourteen or so months after Siemens sent Project Design the signed Purchase Order and Addendum, the parties performed, or attempted to perform, their respective duties described in the Purchase Order. (*See id.* ¶ 63). However, by May 31, 2018, Project Design believed that Siemens's work on the Project was not substantially complete.[9] Siemens avers that only punch list items remained to be completed by May 31, 2018. (*See id.* ¶¶ 63, 92, 97; ECF 47-6 at 101-02; ECF 47-16 at 2). Siemens contends that there were certain actions that it was unable to complete because other work, outside of Siemens's scope, required completion first. (*See* ECF 59 ¶ 79 (citing ECF 47-6 at 168); *see also id.* ¶ 80; ECF 47-5 at 129-30).

In that regard, the parties agree that during the Project some actions could be completed concurrent to other actions, while some actions had to precede other actions, but they dispute which actions were true bottlenecks to completion of the Project. (ECF 59 ¶¶ 26, 32). The order of operations in the Project involved Project Design first installing the physical system components, such as boilers, chillers, and piping. (*Id.* ¶ 29).[10] Next, the boiler and other HVAC components would be started up. (*Id.* ¶ 30). Finally, Siemens was charged with integrating the BAS. (*Id.* ¶ 31).

Project Design avers that the BAS could be integrated into the underlying mechanical components of the HVAC system even when the underlying mechanicals are operating with

---

[9] Project Design provides roughly sixteen pages of evidence in denial of the claim that Siemens substantially completed and performed its job in conformance with the contract. (*See id.* ¶ 63.a-63.dddd). Without expounding on the details at length, the record includes depositions from those involved with the Project, claiming that Siemens failed to (1) properly troubleshoot controls related to its responsibilities and (2) properly program certain equipment—including terminal air boxes. (*See id.*). These alleged deficiencies, among others noted by Project Design, purportedly caused critical issues concerning the air flow within the hospital. (*See id.* ¶ 63.tt).

[10] Boilers control heating and chillers control cooling in a building. (*See id.* ¶ 17).

malfunction. (*See id.* ¶¶ 32-33; *see also* ECF 47-5 at 68).[11] Siemens, on the other hand, argues that the BAS could only be integrated into the underlying mechanical components of the HVAC system after the underlying mechanicals are operating without malfunction. (*See* ECF 59 ¶ 32). More generally, Siemens urges that any alleged insufficiencies on its part are either false or could have been cured by Siemens if given the opportunity. (*See* ECF 60 at 11-13; *see e.g.*, ECF 59 ¶ 44; ECF 60-1 ¶¶ 34, 36-38, 41, 46). The parties are aligned that the chiller system and boilers, installed by Project Design, had mechanical issues that delayed Siemens's work in relation to the contractual agreement. (*See* ECF 59 ¶ 34).[12] Sometime in the Spring of 2018 the chillers were installed by Project Design, and started, but began acting erratically. (*See id.* ¶¶ 36-37).[13] The issues with the chillers are recorded in project tracking documents, shared between the parties.[14] The boiler for the Project had a communication card that did not work, preventing Siemens from integrating the BAS into the boiler. (*See id.* ¶¶ 49-50).[15] Project Design states that Siemens had access to the server and network before June 2018—offering enough time to upload programming, code, and graphics. (*See id.* ¶ 59.a; *see also* ECF 59-1 at 33).[16]

---

[11] In doing so, however, Project Design acknowledges that the BAS will report malfunction if the underlying mechanicals are operating with malfunction. (*See* ECF 59 ¶¶ 32-33).

[12] Siemens argues that the air-handling system's mechanical issues also caused it delays in completing its job. (*See id.*).

[13] The parties agree that Siemens was not responsible for the start-up of the chillers. (*See id.* ¶ 68).

[14] In fact, the chillers continued to operate with serious underlying issues after Siemens was terminated from the Project and were not remedied until October 2018. (*See id.* ¶¶ 39, 41, 74).

[15] The communication card was not Siemens's responsibility and was not corrected until after Siemens was terminated from the Project. (*See id.* ¶¶ 51-52).

[16] Siemens states that its delayed access to the building's computer server and network prevented Siemens from completing the BAS front end system and programming. (*See* ECF 59 ¶¶ 58-59).

6.   Contract Termination

On July 13, 2024, a construction meeting was held, including representatives from Project Design, Siemens, Parkview Health, and the general contractor on the Project. (*See* ECF 59 ¶ 87). After reporting on the status of the Project at the meeting, Siemens was terminated. (*See id.* ¶ 88). That same day Project Design wrote to Siemens, by letter, in relevant part:

> As you are all well aware, after numerous notices to your company, and after numerous subsequent assurances from Siemens, your company has utterly failed on repeated occasions to remedy the problems that have plagued the "HVAC systems" at the captioned facility . . . .
>
> Consequently, I have been instructed by the Owner and General Contractor to advise you that with the mailing/transmission of this notice, to Siemens, any and all contracts Siemens (including any of its subsidiaries) has with [Project Design] for the captioned project, are immediately terminated.

(ECF 47-22 at 2; *see also* ECF 59 ¶ 91 (citation omitted)).

Thereafter, Project Design replaced Siemens with another subcontractor, Innovative Control Systems ("ICS"), to complete work that was originally Siemens's responsibility. (*See* ECF 59 ¶ 95 (citing ECF 47-6 at 199-200)). Project Design indicates that Siemens failed to complete missing coding, which could have been written prior to the chillers becoming operational. (*See id.* ¶ 101). Yet, Siemens disagrees, arguing that certain programming and graphical work were incapable of completion, given underlying issues with the HVAC system. (*See id.* ¶¶ 101-02). Project Design concedes, however, that certain underlying issues associated with the Project prevented Siemens from conducting final testing and fine tuning. (*See id.* ¶ 104).

7.   Damages

In total, Siemens billed Project Design $452,050 and collected $346,329.70 from Project Design. (*See id.* ¶ 109; *see also* ECF 47-28 ¶ 69). In its counter-claims, Siemens seeks to recover the $105,700.30 that it contends Project Design still owes it. (*See* ECF 59 ¶ 109; *see also* ECF 47-28 ¶ 69). Project Design, on the other hand, seeks to recover damages in the amount of

$365,669.91, plus prejudgment interest and attorney fees, on its claims. (*See* ECF 59 ¶ 112.a; *see also* ECF 59-1 at 253).[17] This represents the amount Project Design purportedly paid to complete Siemens's work on the Project after Siemens was terminated. (*See* ECF 59 ¶ 112; *see also* ECF 59-1 at 253).

**B.    Legal Standard: Contract Formation**

Given the parties' reliance on Indiana cases in their briefs, it appears they agree that their contractual dispute is governed substantively by Indiana law. (*See generally* ECF 47-1, 58, 60). Because the contract is predominantly one for services,[18] the Uniform Commercial Code does not apply here, and common law governs. *See e.g*., *Bamcor LLC v. Jupiter Aluminum Corp.*, 767 F. Supp. 2d 959, 972 (N.D. Ind. Feb. 7, 2011) ("Whether the Uniform Commercial Code or common law applies to resolve this dispute is determined by whether the transaction is primarily one for goods or services." (citations omitted)); *see also Insul-Mark Midwest, Inc. v. Mod. Materials, Inc*., 612 N.E.2d 550, 554-56 (Ind. 1993) (using the "predominant thrust test" in determining that the contract was predominately for services, as the predominant purpose for the contract was for the rendition of services, with goods incidentally involved). Therefore, the Court focuses on the legal standard for common law contracts in Indiana.

A valid contract requires "offer, acceptance, consideration, and a meeting of the minds of the parties who are entering the contract." *Bassett v. Scott Pet Prods., Inc*., 194 N.E.3d 1185,

---

[17] However, Siemens contends that Project Design is seeking damages of "approximately $471,370 (that exceeds the Project amount) in damages from Siemens, an amount that purportedly represents the amount paid to complete Siemens' work on the Project." (ECF 59 ¶ 112).

[18] The parties agree that their transaction involved "labor, materials and equipment required to furnish and install temperature controls, control panels, software, programming and other control components for a building automation and temperature control system . . . ." (ECF 59 ¶ 4; *see id*. ¶ 23 (Siemens was obligated to "provide and build a system that managed many of the mechanical systems.")).

1192 (Ind. Ct. App. 2022) (citation omitted).[19] "To bring a contract into existence, an offer must

be extended and the offeree must accept it, the communication of acceptance being crucial." *Ind.*

*Bureau of Motor Vehicles v. Ash, Inc*., 895 N.E.2d 359, 365 (Ind. Ct. App. 2008) (citation

omitted). "[T]he acceptance must meet and correspond with the offer in every respect, neither

falling within nor going beyond the terms proposed, but exactly meeting (those terms) at all

points and closing with them just as they stand." *Uniroyal, Inc. v. Chambers Gasket & Mfg. Co*.,

380 N.E.2d 571, 575 (Ind. Ct. App. 1978) (citation omitted). This rule is commonly known as the

"mirror image rule." *See Martinez v. Belmonte,* 765 N.E.2d 180, 183 (Ind. Ct. App. 2002)

(citation omitted).[20]

    "Generally, the validity of a contract is not dependent upon the signature of the parties."

*Ind. Bureau of Motor Vehicles*, 895 N.E.2d at 366 (citation omitted). "However, some form of

assent to the terms of the contract is necessary. Assent may be expressed by acts which manifest

acceptance." *Id.* (citation omitted); *see also Herald Tel. v. Fatouros*, 431 N.E.2d 171, 174 (Ind.

Ct. App. 1982) ("An acceptance must be evidenced by some overt act and must be

communicated to the offeror . . . . The acceptance may be expressed by acts which manifest the

acceptance." (citing *Young v. Bryan,* 368 N.E.2d 1 (Ind. App. 1977)).

    The Supreme Court of Indiana has adopted the Second Restatement of Contracts as it

pertains to silence or inaction as a means of acceptance—confirming that silence, or inaction, is

the "exception rather than the rule" in Indiana. *Land v. IU Credit Union*, 218 N.E.3d 1282, 1290

---

[19] "To constitute sufficient consideration to create a contract, a benefit must accrue to the promisor, or a detriment must accrue to the promisee." *Id.* (citation omitted). "A benefit is a legal right given to the promisor to which the promisor would not otherwise be entitled." *DiMizio v. Romo,* 756 N.E.2d 1018, 1023 (Ind. Ct. App. 2001) (citation omitted).

[20] "All that is required to render a contract enforceable is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom; absolute certainty in all terms is not required. Only essential terms are necessary for a contract to be enforceable." *Jetz Serv. Co., Inc. v. Ventures*, 165 N.E.3d 990, 994-95 (Ind. Ct. App. 2021) (citations and quotation marks omitted).

(Ind. 2023); *see* Restatement (Second) of Contracts § 69(1) (1981). The Supreme Court of Indiana opined that "the case for acceptance is strongest when the offeree's reliance is definite and substantial or when the offeree's intent to accept is objectively manifested though not communicated to the offeror." *Land*, 218 N.E.3d at 1290 (citation and quotation marks omitted). The first exception construes silence as acceptance "[w]here an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation." *Id.* (citing Restatement (Second) of Contracts § 69(1) (1981)).[21] Secondly, if the offeror informs the offeree that the offer can be accepted through silence or provides a "clear and timely mechanism for rejecting the offer[,]" acceptance may be found. *Mueller v. Karns,* 873 N.E.2d 652, 658 (Ind. Ct. App. 2007). Lastly, previous dealings between the parties, demonstrating the offeree is required to reject the offer through explicit means, may indicate acceptance. *See id*.

Acceptance of an offer that "varies the terms of the offer is considered a rejection and operates as a counter-offer . . . ." *Uniroyal, Inc*., 380 N.E.2d at 575. That is, one cannot accept in part and reject in part, rather, the counter-offer acts as "an end to the negotiations in so far as the original offer is concerned." *Kritz v. Moon*, 163 N.E. 112, 117 (Ind. Ct. App. 1928). A conditional acceptance of an offer is a counter-offer, both amending and superseding the initial offer, while including the initial offer's unamended terms. *See Foltz v. Evans*, 49 N.E.2d 358, 362 (Ind. App. 1943); *see also Janky v. Batistatos*, 559 F. Supp. 2d 923, 929 (N.D. Ind. 2008) (analyzing Indiana

---

[21] One appellate court has articulated that under the first exception, the offeree's silence might constitute acceptance if, following the offeror's offer, the offeree accepted the offeror's services, and at the time of the offer, performance on the part of the offeror was still incomplete. *See cf. Mueller v. Karns*, 873 N.E.2d 652, 658 (Ind. Ct. App. 2007) (refusing the argument that the first exception was met, given the offeror had completed the performance of services, and consequently, the offeree could not have rejected the services after the fact); *see also Decker v. Star Fin. Grp., Inc*., 204 N.E.3d 918, 925 (Ind. 2023) (Goff, J., concurring) (relying on *Mueller's* interpretation of the first exception under Restatement (Second) of Contracts § 69(1)(a) and stating that acceptance cannot be found where the "offeror had performed all services by the time he sent the letter notifying him of terms"); *DiMizio,* 756 N.E.2d at 1022 (not explicitly discussing silence but finding acceptance where the offeree manifested acceptance by changing performance to comply with modified contract terms).

contract law, the district court stated, "an acceptance which varies from the offer is not an acceptance at all, but instead is considered a counteroffer" (collecting cases)). A counter-offer "may be accepted by the original offeror by performing without objection under the terms contained in the counter-offer." *Uniroyal, Inc*., 380 N.E.2d at 575. Thus, "an offer to [contract] on certain conditions, accepted subject to new conditions which are in turn accepted by the original offer[or] produces a contract[,] the terms of which consist of the original offer as amended or changed by the counter-offer." *Foltz*, 49 N.E.2d at 362.

Once a contract is formed, "any modification of a contract requires all of the requisite elements of a contract." *Bassett*, 194 N.E.3d at 1192 (citing *AM Gen. LLC v. Armour*, 46 N.E.3d 436, 443 (Ind. 2015)); *see Zusy v. Int'l Med. Grp., Inc*., 500 Supp. 2d 1087, 1093 (S.D. Ind. June 12, 2007) ("Because a subsequent modification is a contract in its own right, . . . it requires all the requisite elements of a contract." (citation omitted)). "Pursuant to common law contract principles, a written agreement may be modified if there is consideration to support the modification . . . . As a general matter, past consideration does not support a new obligation or promise." *Bassett*, 194 N.E.3d at 1192 (citations omitted). New consideration is found, for example, where the parties add terms in the modified contract—conceding in aspects material to the parties' original agreement. *See e.g., DiMizio*, 756 N.E.2d at 1023 (finding a "bargained-for-exchange" for new consideration).

## C.   Discussion: Contract Formation

Siemens asks in its motion for summary judgment that the Court bar or limit Project Design's claims pursuant to provisions in the Addendum, which Siemens contends controls. (*See* ECF 47-1 at 20; *see also* ECF 47-14 at 5). Further, Siemens seeks summary judgment in its favor on Project Design's breach of contract claim. (*See* ECF 47-1 at 12-18). Lastly, Siemens seeks

13

summary judgment regarding its countersuit of breach of contract and account stated claims against Project Design. (*See id*. at 21-22). The Court will discuss each of these arguments in turn.

    1.  Analysis: The Documents Comprising the Contract

Neither party disputes that a contract exists between them; however, the parties disagree on the contract's formation date and the documents that comprise the contract's terms. (*See* ECF 59 ¶¶ 13-16). Therefore, the Court must first determine which documents govern the relationship between the parties.

Siemens argues that the contract consists of the Purchase Order and Addendum, and that the contract was formed on March 30, 2017, the date Siemens sent the signed Purchase Order and Addendum to Project Design. (*See* ECF 47-2 ¶ 5). On the other hand, Project Design asserts the contract consists of the Purchase Order and the Terms and Conditions, and that the contract was formed as of February 13, 2017, the date of the Purchase Order. (*See* ECF 58 at 4-5).

As stated earlier, the parties' communications of record relevant to contract formation began in mid-February 2017. (ECF 59-1 at 12-18). On February 11, 2017, Project Design emailed Siemens about Siemens's bid and general submittal requirements, concluding: "Your contract number is 1646-315 and it is being typed up now. Please get rolling on shop drawings and call if you have any questions." (*Id*. at 13). Between February 12 and 14, 2017, the parties further discussed the scope of work. (*See id*. at 12, 14-18)

 "The submission of bids is often described as a 'preliminary negotiation.'" *I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.,* 695 N.E.2d 1030, 1035 (Ind. Ct. App. 1998) (citation omitted). "Indeed, a quotation of prices is not an offer, for a mere quotation of price leaves unexpressed many terms that are necessary to the making of a contract." *Id.* (citation omitted). "Consequently, bids are often used as a means to gather information from competitors for the best price possible." *Id.* (citation omitted). "While a price quotation or bid, if detailed

14

enough, can amount to an offer creating the power of acceptance, the submission of a purchase order by a buyer in response usually constitutes an offer." *Id.* (citing 17A Am. Jur. 2d, Contracts, § 46 at 76 (1991)).

On or about February 13, 2017, Project Design sent Siemens the unsigned Purchase Order dated February 13, 2017. (ECF 47-14 at 4; *see* ECF 47-6 at 38; *see also* ECF 59 ¶ 4). The Court considers the Purchase Order as Project Design's offer made in response to Siemens's bid or proposal made in mid-February. *See I.C.C. Protective Coatings, Inc*., 695 N.E.2d at 1035 (clarifying the difference between a bid and an offer). The parties dispute whether the Purchase Order included the Terms and Conditions on its reverse side. (*See* ECF 59 ¶¶ 15, 15.a, 15.e). Siemens contends the Terms and Conditions were not included, but Project Design contends they were, producing evidence that Project Design routinely included the Terms and Conditions on the reverse side of its purchase orders during the relevant period. (*See id*. ¶¶ 15, 15.a, 15.e).

A reasonable jury could only side with Project Design about the Terms and Conditions being included on the reverse side of the Purchase Order sent to Siemens. This is because the Terms and Conditions contain fifteen numbered paragraphs, and the Addendum specifically refers to the "Terms and Conditions", modifying the language of paragraph 12 and adding two new paragraphs numbered 16 and 17. (*See* ECF 47-14 at 5; *see also* ECF 47-24). As such, the Addendum would make no sense absent the Terms and Conditions having been included with the Purchase Order. Therefore, the Court concludes that Project Design's offer was comprised of the Purchase Order, inclusive of the Terms and Conditions ("the Offer").

On March 30, 2017, approximately six weeks after receiving the Offer, Siemens emailed the Purchase Order signed by two representatives of Siemens, supplemented with the Addendum, to Project Design, apologizing for the delay in returning the contract. (ECF 47-14 at 2, 4-5). The email stated: "Siemens has reviewed and accepted your subcontract for the [Project], subject to

the previously agreed addendum. [O]nce signed, please email me the fully executed document."
(*Id*. at 2). There is no evidence of record, however, that Project Design "previously agreed" to the
Addendum before Siemens sent it on March 30, 2017. (*Id*.; *see* ECF 59 ¶ 6.a (stating that Project
Design's owner never discussed the Addendum with anyone at Siemens); *see also* ECF 47-6 at
14; ECF 59-1 at 6). Included on the face of the Purchase Order was a text box, presumably added
by Siemens, stating: "Addendum 1 Attached hereto is incorporated herein and made a part hereof
by this reference." (ECF 47-14 at 4 (capitalization omitted)). The single-page Addendum, dated
March 6, 2017, revised one paragraph of the Terms and Conditions and added two material new
terms in an effort to limit Siemens's liability under the Purchase Order. (*See id*. at 5). There is no
dispute that Project Design never responded to the March 30, 2017, email and never signed and
returned the Addendum.

The parties draw differing legal conclusions from the facts of record. As Project Design
sees it, Siemens accepted the Offer through its silence and conduct prior to March 30, 2017, and
thus, the parties' contract was formed by that date. (ECF 58 at 4-5). As such, Project Design
considers the Addendum a request to modify the parties' contract. (*Id*. at 5). In support, Project
Design points to Siemens's conduct from mid-February to March 30, 2017, emphasizing that
during this timeframe Siemens attended two meetings that, at least in part, were each geared
toward coordinating tasks associated with the Project, and submitted an RFI. (*See* ECF 59 ¶ 5.i-j,
l-n; *see also* ECF 58 at 4). Project Design further points to the language of the Addendum itself,
which states: "The parties agree that this Addendum *modifies* the Agreement between the parties
dated February 13, 2017[,] and is incorporated therein by this reference." (ECF 47-14 at 5
(emphasis added); *see* ECF 58 at 4).

But neither party avers that the parties contemplated silence for a particular duration as the operation of acceptance to the Purchase Order.[22] *See* Restatement (Second) of Contracts § 69(1)(b). So, any argument that Siemens's silence from February 13, 2017, to March 30, 2017, counted as manifest acceptance of the Offer is tempered by the practical aspects of business negotiations during a complex engineering transaction for a Project that could potentially take a year, or longer, to complete. (*See* ECF 47-13 at 13 (setting forth a substantial completion date between the general contractor and Project Design of April 1, 2018)). To find manifest acceptance of the Offer by Siemens, the Court must observe that Siemens objectively intended to accept the Offer, though not directly communicated to Siemens, prior to March 30, 2017. *See Land*, 218 N.E.3d at 1290. But even if Siemens attended two Project meetings and submitted an RFI, the record does not objectively demonstrate Siemens assented to the terms of the Offer through its attendance or submission of an RFI. Indeed, with at least one kick-off meeting in March 2017, Siemens was informed that its attendance was requested because the Project leader informed Project Design to forward the meeting to "any second tier subcontractors that *may* be involved . . . ." (ECF 59-1 at 19; *see* ECF 59 ¶ 5.i). Such permissive language does not indicate agreement to the terms of the Offer.

"The ultimate goal of any contract interpretation is to determine the intent of the parties at the time that they made the agreement." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012) (citation omitted). Although one sentence in the Addendum paints it as a contract modification, this fact is outweighed by Siemens's email, which attached the Addendum, that clearly conveyed Siemen's acceptance of the Offer as conditional on the Addendum. (*See* ECF

---

[22] Even if Project Design did make such an argument, the Supreme Court of Indiana has confirmed that the "mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Land*, 218 N.E.3d at 1290 (citation omitted). To find agreement in such a case, the offeree's reliance must be "definite and substantial" or the offeree's "intent to accept is *objectively* manifested though not communicated to the offeror." *Id.* (emphasis added) (citation omitted).

47-14 at 2 ("Siemens has reviewed and accepted [the Offer], *subject to* the previously agreed addendum." (emphasis added))). As explained earlier, under Indiana common law a conditional acceptance of an offer is a counter-offer, both amending and superseding the initial offer, while including "all of the terms and conditions of the original offer not inconsistent with those of the counter-offer . . . ." *Foltz*, 49 N.E.2d at 362; *see Janky*, 559 F. Supp. 2d at 929. Therefore, the Court concludes as a matter of law that the Addendum, the Purchase Order, and the Terms and Conditions constituted Siemens's counter-offer to Project Design ("the Counter-Offer"). *See I.C.C. Protective Coatings, Inc.*, 695 N.E.2d at 1035 ("An acceptance which varies the terms of the offer is considered a rejection and operates as a counteroffer, which may be then accepted by the original offeror." (citation omitted)); *see also Martinez*, 765 N.E.2d at 183.

As stated earlier, it is undisputed that Project Design never expressly rejected or accepted the Counter-Offer. Rather, Project Design remained silent and performed its contractual responsibilities through July 2018, paying Siemens $346,329.70 for services rendered. (ECF 59 ¶ 109). That is, Project Design neither contested the Addendum nor sought clarity regarding its previous Offer. Once Siemens sent the Counter-Offer, Project Design was required to either reject or accept it. *See e.g., Bamcor LLC*, 767 F. Supp. 2d at 973 ("By performing after receiving Jupiter's purchase order, Bamcor accepted the terms of Jupiter's purchase order, which included a paragraph declaring void all inconsistent and additional terms Bamcor previously proposed."). Project Design performed on the contract without complaint to the Addendum, and thus, Project Design's performance from March 2017 to July 2018 qualified as acceptance of the Counter-Offer. *See id*; *see also DiMizio*, 756 N.E.2d at 1022 (finding manifest acceptance through a party's performance).

Consequently, the Court concludes as a matter of law that the parties' contract consists of the Addendum, the Purchase Order, and the Terms and Conditions. *See Foltz*, 49 N.E.2d at 362.

Accordingly, the Court will GRANT Siemens's motion for summary judgment to the extent it asks that Project Design's claims be subject to the Addendum. (*See* ECF 47-14 at 5). Having said that, the Court concludes that the record is insufficiently briefed as to the Addendum's effect on Project Design's claims, as the parties' arguments primarily focused on which documents comprise their contractual relationship. (*See* ECF 47-1 at 20-21; ECF 58). Now that the Court has made that determination, the Court will grant Siemens leave to file a second motion for summary judgment focused on the extent to which the governing contract—that is, the Addendum, Purchase Order, and the Terms and Conditions—preclude or limit Project Design's claims and damages in this case.

## D. Legal Standard: Breach of Contract and Substantial Performance

The entry of summary judgment can be granted in a contract dispute where breach of a contract is material. *See Five Star Roofing Sys., Inc. v. Armored Guard Window & Door Grp., Inc.,* 191 N.E.3d 224, 237 (Ind. Ct. App. 2007) ("[A]n injured party is not discharged from his or her duty to perform unless (1) the breach is material,[23] and (2) it is too late for performance or an

---

[23] Indiana follows the Restatement (Second) of Contracts in determining whether a failure to perform amounts to material breach. *See Frazier v. Mellowitz*, 804 N.E.2d 796, 802 (Ind. Ct. App. 2004); *see also Dick ex rel. Amended Hilbert Residence Maint. Tr. v. Conseco, Inc.*, 458 F.3d 573, 578 (7th Cir. 2006) (quoting *Frazier*, 804 N.E.2d at 802). Those factors are as follows:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Frazier*, 804 N.E.2d at 803 (quoting Restatement (Second) of Contracts § 241 (1981)).

offer to perform to occur." (citation omitted)). "The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind. Ct. App. 1993) (citation omitted); *see Alexander v. Linkmeyer Dev. II, LLC*, 119 N.E.3d 603, 612 (Ind. Ct. App. 2019). "Whether a breach is material is generally a question of fact to be decided by the trier of fact." *State v. Int'l Bus. Machs. Corp.*, 51 N.E.3d 150, 158 (Ind. 2016) (citation omitted). "A material breach is often described as one that goes to the 'heart of the contract.'" *Id.* at 158-59 (citation omitted).

Notably, in Indiana a material breach can be cured even if there is a "failure to perform" obligations, under a contract, by the breaching party. *Frazier*, 804 N.E.2d at 802-03 (following the Restatement (Second) of Contracts). "[A] material failure to perform operates as the nonoccurrence of a condition which has two possible effects: (1) preventing the activation of the duty [to perform], at least temporarily, and (2) discharging the duty when the condition can no longer occur." *Id.* at 803.

> The nonoccurrence of a condition does not immediately discharge the duty [to perform] since there may still be time during which the condition can occur. Even though there has been a failure to perform (or failure to make an offer to perform) at the appointed time, the breaching party may perform or offer to perform shortly thereafter which has the effect of "curing" the breach to the extent that the breach is no longer material . . . .
>
> The . . . structure in the Restatement (Second) apparently requires a determination of materiality of failure to perform exclusive of any question of delay in performance. If the determination of materiality is made as to a particular failure to perform, the effect is to suspend the duty of the injured party (assuming there is time remaining for a possible cure). If the time for cure expires . . . , the uncured material failure to perform or offer to perform has the effect of discharging the duty of the injured party.

*Id.* (italics omitted). The determination as to the amount of time a breaching party has in curing a material failure to perform, before the non-breaching party's duty to perform is discharged, falls under Section 242 of the Restatement (Second) of Contracts. *See id.* at 804.[24] If there is some

---

[24] The factors are as follows:

amount of time between suspension of performance by the injured party, and discharge, the breaching party can use that time to cure the breach. *See id*. "Even then, since any breach gives rise to a claim, a party who has cured a material breach has still committed a breach, by his delay, for which he is liable in damages." *Id.* (citation omitted).

"Contract law has long recognized substantial performance rather than strict performance as being sufficient in many situations." *ShermansTravel Media, LLC v. Gen3Ventures, LLC*, 152 N.E.3d 616, 624 (Ind. Ct. App. 2020) (citation omitted); *see Johnson v. Taylor Bldg. Corp*., 371 N.E.2d 404, 406 (Ind. Ct. App. 1978) (applying the substantial performance doctrine to a construction contract). Substantial performance "applies where performance of a nonessential condition is lacking, so that the benefits received by a party are far greater than the injury done to him by the breach of the other party." *ShermansTravel Media, LLC*, 152 N.E.3d at 624 (quoting *Dove v. Rose Acre Farms, Inc*., 434 N.E.2d 931, 933 (Ind. Ct. App. 1982)). "[W]hether a party has committed a material breach is a question of fact . . . ." *Id.* at 626 (citation omitted). "No mathematical rule relating to the percentage of the price, of cost of completion, or of completeness can be laid down to determine substantial performance of a building contract." *Johnson*, 371 N.E.2d at 406 (citation omitted) (holding that a contractor's failure to secure a septic permit before construction did not bar his recovery under a mechanic's lien where the contractor substantially fulfilled all requirements of the contract except for the final act of

---

(a) those stated in § 241;

(b) the extent to which it reasonably appears to the injured party that delay may prevent or hinder him in making reasonable substitute arrangements;

(c) the extent to which the agreement provides for performance without delay, but a material failure to perform or to offer to perform on a stated day does not itself discharge the other party's remaining duties unless the circumstances, including the language of the agreement, indicate that performance or an offer to perform by that day is important.

*Id*. at 804 (quoting Restatement (Second) of Contracts § 242 (1981)).

installing the septic system). Yet, "[t]he considerations in determining whether performance is substantial are those listed in [Restatement (Second) of Contracts] § 241 for determining whether a failure is material." *ShermansTravel Media*, 152 N.E.3d at 627 (first alteration in original) (citation omitted).

When the party claiming breach has prevented the other party from properly performing, Indiana courts will decline to find that the non-claimant has breached the contract. *See Rogier v. Am. Testing & Eng'g Corp*., 734 N.E.2d 606, 620 (Ind. Ct. App. 2000). "[T]he common law of contracts excuses performance of one party where the other party wrongfully prevents that performance." *Id.* (citations omitted). This is because a party cannot "rely on the failure of a condition precedent to excuse performance where that party's own action or inaction caused the failure." *Id.* at 621. "When a party retains control over when the condition will be fulfilled, it has an implied obligation to make a reasonable and good faith effort to satisfy the condition." *Id.* (citation omitted).

**E.  Discussion: Project Design's Breach of Contract Claim**

Siemens's motion for summary judgment asks the Court to dismiss Project Design's breach of contract claim. (ECF 47-1 at 22). Yet, the Court cannot dismiss that claim based on the record set forth in this case. There are several material disputes as to facts involving the parties' contract that a factfinder must assess—not this Court. *See Payne*, 337 F.3d at 770; *see also* Fed R. Civ. P. 56(c).

1.   Programming Logic and Graphical Package

The parties agree that Siemens was expected to write programming logic so that the BAS would direct the various components of the HVAC system to act to the Project's specifications. (*See* ECF 58 at 10; *see also* ECF 59 ¶¶ 21-23). The parties disagree, however, as to whether Siemens completed all possible logic. (*See* ECF 58 at 10; *see also* ECF 59 ¶ 101). Siemens

contends that certain missing logic was incapable of completion without the chiller's operability,[25] while Project Design argues that the chiller was not a bottleneck to Siemens's completion of logic programming. (*See* ECF 59 ¶ 101). Similarly, the parties also dispute whether Siemens finished all graphical work capable of completion. (*See* ECF 59 ¶ 59; *see also* ECF 58 at 11; ECF 60 at 12).[26] Both parties have offered evidence creating a genuine dispute of material facts. Accordingly, whether the chillers prevented Siemens from completing certain logical and graphical programming, are questions of fact to be decided by a fact-finder. *See Payne*, 337 F.3d at 770; *see also Five Star Roofing Sys., Inc.*, 191 N.E.3d at 237.

2.  Terminal Air Boxes and Exhaust Fans

Siemens does not dispute Project Design's assertion that Siemens was charged with integrating all of the components of the HVAC system into the BAS—including both major components like boilers and chillers, and also hundreds of smaller components that are deployed around the hospital, like terminal air boxes (sometimes called TABs or VAVs). (*See* ECF 58 at 11; *see also* ECF 59 ¶ 31; ECF 60 at 12). There is a contention as to whether the TABs were correctly programmed in accordance with the parties' agreement.[27] Siemens rebuts that "[e]ven if the VAVs or TABs were incomplete in the manner alleged by [Project Design], such work would

---

[25] Siemens propounds that programming and graphical work could not be completed because testing and, or, feedback, was required to ensure that that the systems responded predictably. (ECF 59 ¶ 102).

[26] Project Design states that "Siemens was also responsible for creating a graphics package." (ECF 58 at 11; *see also* 59 ¶ 55.a). "The graphics are supposed to provide a digital representation of all aspects of the HVAC systems, so that the end-user can monitor every part of the system." (ECF 58 at 11; *see* ECF 59 ¶¶ 63.b, 63.i). Project Design continues, stating "[m]any of the graphics that were created were incomplete, and many devices and components that should have been on the graphics simply weren't there." (ECF 58 at 11; *see* ECF 59 ¶¶ 63.z, 63.pp, 63.qq, 63.uuu, 63.vvv).

[27] Project Design contends that approximately 200 TABs located throughout the building required reprogramming because Siemens incorrectly programmed the TABs to reset once a day. (*See* ECF 58 at 11). According to Project Design, Siemens's programming caused the airflow in the hospital to shut off, "which would then cause a room to go from a state of positive air pressure to negative, which in a space like an operating room can allow contaminants to enter." (*Id*.; *see* ECF 59 ¶ 37). Project Design also asserts that the Project's commissioning agent noted other problems with the TABs, including a "failure to maintain an appropriately tight temperature range and instances where a hot water valve should be open but wasn't." (ECF 58 at 11; *see* ECF 59 ¶ 63.www).

have only taken a matter of hours or days to complete." (ECF 60 at 12; *see* ECF 59 ¶ 100; ECF 47-7 at 26-27). Relatedly, Project Design also argues that Siemens's work was deficient as its programming caused dampers and exhaust fans to open—or fail to open—when the programming should have done otherwise. (*See* ECF 58 at 10; *see also* ECF 59 ¶ 63.www). Further, there were "items missing from the graphics, uninstalled tubes in an air flow measuring station, and graphics showing a hot water valve as being closed when it was actually open." (ECF 58 at 10; *see* ECF 59 ¶ 63.pp). Siemens responds with evidence that graphics and logic were substantially complete by the time Siemens was terminated. (*See* ECF 60 at 12; *see also* ECF 59 ¶¶ 63, 92, 97; ECF 47-6 at 101-02).[28] However, a fact-finder must determine whether these alleged non-conformities occurred, and—assuming arguendo Siemens did breach— whether Siemens's breach was material to the contract. *See Payne*, 337 F.3d at 770; *see also Five Star Roofing Sys., Inc.*, 191 N.E.3d at 237. Consequently, Siemens's motion for summary judgment to dismiss Project Design's breach of contract claim will be denied.

In accordance with Restatement (Second) of Contracts § 241, a fact-finder could determine that Siemens's performance as it pertains to its programming logic, the graphical package, and other specifications was materially inadequate, depriving Project Design of the benefit to which it was reasonably expected. *See Frazier*, 804 N.E.2d at 803; *see also* Restatement (Second) of Contracts § 241(a) (discussing the extent to which an injured party will be deprived of the benefit which it reasonably expected). If Siemens's performance was materially inadequate, Project Design might have been justified in withholding $105,700.30. (*See* ECF 59 ¶ 109; *see also* ECF 47-28 ¶ 69). Further, Project Design attests that because of Siemens's purported lack of performance, Project Design was required to hire a new

---

[28] Siemens avers that certain "fine-tuning" of the graphics and the logic could not be completed as the HVAC system did not function appropriately at the time of Siemens's termination. (ECF 60 at 12; *see* ECF 59 ¶¶ 84-86, 104).

subcontractor—causing additional costs. (*See* ECF 59 ¶¶ 95, 112; *see also* ECF 59-1 at 253). A fact-finder could determine that Siemens's performance on the Project was a material breach and that Project Design can be adequately compensated in damages for the additional costs it absorbed in terminating Siemens and hiring ICS. *See Frazier*, 804 N.E.2d at 803; *see also* Restatement (Second) of Contracts § 241(b) (discussing the extent to which the injured party can be adequately compensated).[29] Because a fact-finder must assess the facts to determine whether Siemens did breach, whether the breach was material, and whether Siemens was given time to cure such breach, summary judgment is inappropriate as to Project Design's breach of contract claim.

### F.  Discussion: Siemens's Breach of Contract Counter-Claim

Siemens's motion for summary judgment also asks the Court to find in Siemens's favor on its counter-claim for breach of contract, asserting that it substantially performed on the contract and that any non-performance on behalf of Siemens was due to Project Design's breach of contract. (*See* ECF 47-1 at 12-22). However, the Court will deny Siemens's motion for summary judgment regarding its breach of contract counter-claim for the same reasons that the Court will deny Siemens's motion for summary judgment to dismiss Project Design's breach of contract claim. There are several disputes as to material facts involving the parties' contract that a factfinder must assess—not this Court. *See Payne*, 337 F.3d at 770; *see also* Fed R. Civ. P. 56(c).

Siemens avers that it completed 98-99% of the contractual scope of work and that Project Design prevented the remaining performance by wrongfully terminating Siemens. (*See* ECF 47-1 at 12-13). According to Siemens, it was unreasonable for Project Design to expect Siemens to

---

[29] Even if a fact-finder determines Siemens was not given time to cure a material breach, Siemens could still be liable for any injury its delay caused. *See Frazier*, 804 N.E.2d at 804.

build a BAS for the HVAC system, given the malfunction of certain mechanical systems outside of Siemens's control. (*See id.* at 13; *see also* ECF 59 ¶¶ 32-33, 65).[30] Nevertheless, if there are material issues of fact as to whether Siemens substantially performed under the contract, the Court cannot grant summary judgment on Siemens's counter-claim for breach of contract. *See ShermansTravel Media, LLC*, 152 N.E.3d at 626. Project Design rebuts Siemens's claim of substantial performance, contending that certain programming logic and a graphics package were insufficiently created by Siemens. (*See* ECF 58 at 11; *see also* ECF 59 ¶¶ 59, 63.z, 63.mm-63.qq, 63.ss, 63.yy, 63.bbb-63.ggg, 63.uuu-63.www). Project Design also contends that certain terminal air boxes and exhaust fans were incorrectly programmed. (*See* ECF 47-1 at 11-12; ECF 59 ¶¶ 63.z, 63.aa, 63.vvv, 63.www).

In response, Siemens argues that any alleged insufficiencies are either false or could have been cured by Siemens if given the opportunity. (*See* ECF 60 at 11-13; *see e.g.*, ECF 59 ¶ 44; ECF 60-1 ¶¶ 34, 36-38, 41, 46). Given the factual conflict between the parties over circumstances that are arguably material to the parties' contract, a fact-finder must determine whether Siemens substantially performed on the contract to determine the outcome of Siemens's counter-claim for breach of contract. *See ShermansTravel Media*, 152 N.E.3d at 627; Restatement (Second) of Contracts § 241; *see also Payne*, 337 F.3d at 770; Fed R. Civ. P. 56(c). Therefore, Siemens's motion for summary judgment on its breach of contract counter-claim will be denied.

## G.  Discussion: Siemens's Account Stated Counter-Claim

Siemens's final request in its motion for summary judgment is that the Court grant its account stated counter-claim. "An account stated is an agreement between the parties that all

---

[30] These systems include the chiller system, air-handler system, and boilers. (*See* ECF 47-1 at 14). The parties agree that the chillers malfunctioned past the time Siemens was terminated. (*See* ECF 59 ¶ 66).

items of an account and balance are correct, together with a promise, express or implied, to pay the balance." *Jackson v. Trancik*, 953 N.E.2d 1087, 1091 (Ind. Ct. App. 2011) (citation omitted). "An account stated 'operates as a new contract without the need for renewed consideration, and the [movant] does not need to plead and prove the creation and performance of each contract underlying the account.'" *Id*. (citation omitted). "An agreement that the balance is correct may be inferred from delivery of the statement together with the account debtor's failure to object to the amount of the statement within a reasonable time." *Id*. (citation omitted). "When a debtor fails to object to an account until after a lawsuit is filed, such will generally be considered a failure to object within a reasonable time and will support an inference of the debtor's implied agreement that the account balance is correct." *Id*. (citation omitted). "Although the amount indicated on a statement is not conclusive, it is prima facie proof of the amount owed on the account." *Id*. (citation omitted). "Once a prima facie case is established on an account, the burden shifts to the account debtor to prove that the claimed amount is incorrect." *Id*. at 1091-92. (citation omitted).

In this case, the Court cannot grant Siemens's motion for summary judgment on its account stated counter-claim.[31] Siemens contends that it performed to reasonable satisfaction under the contract and sent Project Design a payment application for the release of retention, totaling $452,050, with a net balance of $105,700.30. (*See* ECF 47-1 at 22; *see also* ECF 47-28 ¶ 69; ECF 59 ¶ 109). To find in favor of Siemens, the Court must first find that the parties agreed on the balance. *See Jackson*, 953 N.E.2d at 1091. Yet, there are factual disputes between the parties regarding what is owed, precluding summary judgment. *See id*. at 1094 (denying summary judgment on an account stated claim because there was a genuine issue of material fact regarding the amount owed).

---

[31] The Court interprets Siemens's account stated counter-claim as an action in the alternative of its breach of contract counter-claim.

First, Project Design initiated this action, claiming that Siemens owes Project Design.[32] (*See* ECF 3-2). According to Indiana law, this response to Siemens's payment application counts as a timely objection. *See Jackson*, 953 N.E.2d at 1091. Second, Project Design informed Siemens that it was terminated due to its failure to perform to Project Design's expectations and paid Siemens $346,329.70. (*See* ECF 59 ¶¶ 91, 109). Project Design's termination notification and decision to pay less than Siemens's requested amount could also be reasonably understood as a timely objection to the amount of the statement. Given there are issues of fact pertaining to the amount owed to Siemens, the Court will deny Siemens's motion for summary judgment on its account stated counter-claim. Accordingly, a trier of fact must make the determination as to whether the parties agreed on the balance of $105,700.30.

## H.  Conclusion

For the reasons given herein, Siemens's motion for summary judgment (ECF 47) is GRANTED IN PART and DENIED IN PART as set forth herein. Siemens is granted to and including April 8, 2025, to file a second summary judgment motion, not to exceed 14 pages, as to the effect of the parties' governing contract—that is, the Addendum, Purchase Order, and Terms and Conditions—on Project Design's claims. No separate supporting memorandum or statement of material facts is requested. Project Design is afforded to and including April 22, 2025, to file a response brief, not to exceed 14 pages, and Siemens is afforded to and including April 29, 2025, to file a reply brief, not to exceed 7 pages.

SO ORDERED. Entered this 25th day of March 2025.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[32] This fact obviates an inference that the parties agreed on the amount owed to Siemens. *See Jackson*, 953 N.E.2d at 1091.